IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

GUS VAKAS and GEORGE VAKAS,      )
                                 )
              Plaintiffs,         )
                                 )
v.                               )         No.  06-1152-WEB
                                 )
THE PENN MUTUAL LIFE             )
INSURANCE COMPANY,               )
                                 )
              Defendant.          )
_____)

**Memorandum and Order**

The plaintiffs allege that defendant Penn Mutual Life Insurance Company is obligated to make payment on two insurance policies with accidental death benefits.  The policies were issued by Penn Mutual to Dr. John Louis Vakas in 1969.  Dr. Vakas died on March 13, 2005, while the policies were still in effect.  The plaintiffs, who are Dr. Vakas' brothers, are the surviving beneficiaries under the policies.

The matter is now before the court on the parties' cross-motions for summary judgment.  The issue turns upon an exclusion in the policies for death "result[ing] directly or indirectly from ... illness or disease of any kind or from physical or mental infirmity...."  Dr. Vakas fell at his home on February 8, 2005, fracturing his hip.  Prior to and at the time of the fall he was suffering from various medical conditions, including chronic renal failure, diabetes, and hypertension.  While he was en route to the hospital in an ambulance after falling, Dr. Vakas went into cardiac arrest.  He was hospitalized from February 8th until his death on March 13th.  No autopsy was performed.  The death certificate listed atherosclerotic cardiovascular disease as the immediate cause of death and indicated the manner of death was accident.  Penn Mutual argues that the policy exclusion for death

resulting from disease applies because Dr. Vakas' death resulted from heart disease.  Plaintiffs contend Dr. Vakas' life was shortened due to his fall and fractured hip, and that Kansas law would consider his death to be a result of the accident, such that the policy exclusion does not apply.

This court's jurisdiction over the dispute is based on diversity of citizenship.  *See* 28 U.S.C. § 1332.  The parties agree that the substantive law of Kansas, including Kansas contract law, governs the dispute.  Doc. 21 at p.2.

I. *Uncontroverted Facts*.

The court finds the following facts to be uncontroverted for purposes of summary judgment.

1.  The defendant issued life insurance policy No. 5 503 545 to John Louis Vakas in the amount of $100,000. This policy has an accidental death benefit in the amount of $100,000. This policy was issued on March 5, 1969 and was in force when John Louis Vakas died on March 13, 2005. (Exh. 1 at 1; Complt. ¶4; Ans. ¶4).

2. Policy No. 5 503 545 shows the "class 1" beneficiaries as Louis Vakas, birth date 1899, the father of John Louis Vakas, and Thelma Vakas, birth date 1914, the mother of John Louis Vakas. (Exh. 1 at 14).

3. (Stelios) Louis Vakas, birth date November 25, 1888, died on January 9, 1973 (Exh. 3 at 7) and Thelma Vakas died on November 3, 1994 (Exh. 3 at 5). See also the statement of Gus Vakas. (Exh. 16) Thus, all of the class 1 beneficiaries of this policy predeceased plaintiffs. The "class 2" beneficiaries are the "surviving brothers." John Louis Vakas had only the plaintiffs as his siblings.

4. The defendant issued life insurance policy No. 5 511 228 to John Louis Vakas in the amount of $100,000. This policy has an accidental death benefit in the amount of $50,000. This policy was issued on May 22, 1969 and was in force when John Louis Vakas died on March 13,

2005. (Exh. 2; Complt. ¶5; Ans. ¶4).

5.  Mary H. Dudley, M.D., is a forensic pathologist.  She is the Director of the Sedgwick County Forensic Science Center and the Chief Medical Examiner and District Coroner.  She reviewed the medical history of Dr. Vakas and summarized his medical history, as of the time he was admitted to the Jane Phillips Medical Center on February 8, 2005, as follows:

This 66 year old white male, John L. Vakas, M.D. was apparently in good health and actively practicing medicine until January 8, 1987 at age 50 when he slipped on ice and injured his cervical vertebrae, C6 and C7. This injury resulted in severe chronic neck and arm pain. Dr. Vakas was been [sic] declared total continuous disabled by his medical specialists and was forced to retire from his medical practice since his accident. He developed additional medical problems over the years including insulin dependent diabetes mellitus, chronic renal failure requiring dialysis, congestive heart failure, hypothyroidism and hypertension. However, he was able to care for himself at home and was fairly self-sufficient until the morning of February 8, 2005 when he fell in his residence and fractured his right hip.

(Exh. 11; Dep. Dr. Dudley Exh. 1 at 2).

Dr. Dudley was unaware when she issued her report that Dr. Vakas had previously undergone a heart catheterization.  The fact that he had, however, would not have impacted her opinion that the manner of death was accidental.  Pl. Exh. 11 at 20, 31.  In her opinion, Dr. Vakas died as a result of complications of the fractured hip.  *Id*. at 19.

6. On the day of his accident, February 8, 2005, Dr. Vakas was in the family home with plaintiffs. (Exh. 10 at 4) George was planning to drive Dr. Vakas to Bartlesville that day for dialysis treatment. (Exh. 10 at 27; Exh. 9 at 7) George drove Dr. Vakas to Bartlesville, OK for dialysis treatment three times each week. (Exh. 10 at 6) While George was eating breakfast, he saw Dr. Vakas walking through the kitchen to the bathroom, in preparation for the trip to Bartlesville. George saw Dr. Vakas lose his balance and fall backwards onto the floor. (Exh. 10 at 3-4) Gus heard the fall and came immediately to the kitchen. (Exh. 9 at 7-8) Within a few minutes, Gus telephoned

the Bartlesville ambulance, which was approximately 35 miles from the Vakas' home in Coffeyville, Kansas. (Exh. 9 at 8-10) Gus telephoned the Bartlesville ambulance to take Dr. Vakas to Bartlesville rather than a hospital in Coffeyville because there was no dialysis facility in Coffeyville. (Exh. 9 at 11) While waiting for the ambulance to arrive, Gus and George tried to make Dr. Vakas comfortable. They were unable to move him from the kitchen floor (Exh. 10 at 7), but provided a blanket and a pillow for him (Exh. 9 at 9). While waiting for the ambulance, Gus and George talked to Dr. Vakas,

who said he had pain in his hip and right leg. (Exh 9 at 9) He did not have a problem breathing, did not complain of chest pains, did not say he was having a heart attack, did not appear to be having any respiratory or cardiac problem. (Exh. 10 at 7-8).

Dr. Vakas had atherosclerotic cardiovascular disease, which is a progressive disease. Doc. 25-3, Depo. p. 45. He also had diabetes, and due to kidney failure from diabetes he had to undergo dialysis three times a week. *Id*. at 46. These conditions may have been worsened by his fall on February 8th. *Id*.

7. The Bartlesville EMS ambulance arrived at the Vakas' home at 10:28 a.m. on February 8, 2005. The ambulance chronology record indicates that when the ambulance arrived, the patient was "a 66 yr. old White Male with a primary complaint of FALLS/WITH INJURY." with a history of "Renal Failure\HTN\Cardiac\Diabetes type 1." Dr. Vakas was moved into the ambulance. The ambulance personnel administered Valium to Dr. Vakas, after which he "WENT UNRESPONSP. QUIT BREATHING, AND HEART RATE DROPPED TO 30 . . . ." The ambulance personnel applied resuscitation measures to Dr. Vakas and transported him to the Jane Phillips Hospital in Bartlesville, Oklahoma. (Exh. 6 at 1).

8. The ambulance with Dr. Vakas arrived at the Jane Phillips Medical Center. The clinical impression included cardiac arrest, respiratory arrest, and possible right hip fracture. (Exh. 7 at 2) Medical providers at Jane Phillips Medical Center concluded that Dr. Vakas should be transferred to another hospital because he needed a "higher level of care." (Exh. 7 at 3) The Bartlesville EMS ambulance transported Dr. Vakas to the St. Francis Hospital in Tulsa, Oklahoma, arriving on February 8, 2006 at 6:05 p.m.

9. Dr. Vakas arrived at the St. Francis Hospital in "status post cardiac arrest" on February 8, 2005. Dr. Vakas remained in the St. Francis Hospital until his death on March 13, 2005.  Gus and George visited Dr. Vakas every other day during his hospitalization at St. Francis but Dr. Vakas was only able to respond or speak to them on one or two occasions. (Exh. 9 at 22). According to the report of Dr. Edward T. Erbter, Dr. Vakas' attending physician at St. Francis, the cause of death was "Acute myocardial infarction" and "Cardiogenic shock." (Exh. 8 at 1).

Dr. Andrew Sibley, who signed the death certificate, based his opinion as to cause of death upon information received from St. Francis Hospital.  Doc. 25-4.  His opinion was that Dr. Vakas' "death resulted directly from the myocardial infarct in the setting of atherosclerotic cardiovascular disease and that other conditions including the hip fracture played more indirect and minor roles." He stated that he did not know how the diabetes, renal failure and hypertension contributed specifically to death, although they likely played some role, at least in combination.

10. Based on her examination of the medical records for Dr. Vakas, Dr. Dudley opined, "As soon as he fell, he had a downward spiral of events that led to his death." (Exh. 11 at 16).  Dr. Michael Andrew Sibley, M.D., Medical Examiner, opined that "it's not just coincidental that his heart or breathing stopped right after he fractured his hip. And I think it's reasonable to conclude

that that anoxic period, whatever period it was, I don't know for sure, probably played some role in making his pre-existing condition worse." (Exh. 12 at 16). "And I think that but for the fracture, he probably would not have died at that time, that soon. But for the fact that he was lying in bed for 5 - - 5 weeks, essentially immobilized or not - - not mobile like he used to be. (Exh. 12 at 18). "[B]ut for the fracture, he probably would have survived longer." (Exh. 12 at 21). Transamerica's Medical Director, Jerome Miller, D.O., opined that Dr. Vakas "[M]ay have died SLIGHTLY sooner because of the fall." (Exh. 14 at 11) (emphasis in original).

11. Dr. Sibley signed the certificate of death for Dr. Vakas. (Exh. 12 at 8) .  He identifies the manner of Dr. Vakas' death as "accidental" (Exh. 12 at 24), and identifies the "immediate cause" of death as "atherosclerotic cardiovascular disease" (i.e., heart disease) (Exh. 12 at 24).

Under a section on the death certificate for "other significant conditions contributing to death," Dr. Sibley listed diabetes mellitus, renal failure, hypertension, and hip fracture."

12. Copies of the insurance policies are attached as Exhibits 1 and 2. The accidental death benefit of policy number 5 503 545 is $100,000. (Exh. 1 at 1) The accidental death benefit of policy number 5 511 228 is $50,000. (Exh. 2 at 3).

13. The accidental death benefit agreement, for both policies, is as follows:

THE PENN MUTUAL LIFE INSURANCE COMPANY
agrees, subject to the provisions of this supplemental
agreement, to pay the Accidental Death Benefit stated in
the Schedule of Benefits on page 3 of the policy upon
receipt of due proof of (I) of death of the insured as the
result, directly or independently of all other causes, of
accidental bodily injury evidenced by a visible contusion
or wound on the exterior of the body (except in the case
of internal injury revealed by an autopsy or of drowning);
(ii) that such death occurred within 90 days after such
injury was sustained and before termination of this
agreement; and (iii) that such death occurred before the

policy anniversary nearest the Insured's 70th birthday
and, if this agreement is issued before age five, on or
after the policy anniversary nearest the insured's fifth
birthday.

(Exh. 1 at 12; Exh. 2 at 15).

    14. The exclusions for accidental death benefits, for both policies, are as follows:

The Accidental Death Benefit shall not be payable if the
Insured's death results directly or indirectly from:
(1) illness or disease of any kind or from physical or
mental infirmity;
(2) taking poison, a drug, medicine or sedative, whether
such taking be voluntary or otherwise;
(3) inhaling gas of any kind . . . .;
(4) suicide, whether sane or insane.
(5) commission by the insured of an assault or felony;
(6) travel, flight or descent in or from any kind . . . .;
and,
(7) war or an act of war . . . ."

(Exh. 1 at 12; Exh. 2 at 15)

    15. Penn Mutual's stated reasons for its denial of plaintiffs' claims are as follows:

Although the death certificate does indicate that the
manner of death was accidental, Penn Mutual's Medical
Director spoke with the Medical Examiner and was
informed that it is standard practice to so indicate
whenever there was any accident at all during the final
illness. The Medical Examiner also indicated that he had
not examined your brother. Based on the evidence
presented, it is our opinion that your brother's various
diseases were in an active and advanced state and
progressive in nature at the time of the accident, and that
his various diseases, - not the accident- were the cause of
his death. Therefore, under the terms of the Accidental
Death Benefits, no additional benefit is payable.

Kansas law also states that if a disease is active and in an
advanced state and progressive in character when the
accident occurred, the proximate cause of death would be
the disease itself. That is the situation in this case.

7

[Y]our brother suffered from a number of other illnesses
and diseases that were in an active, advanced and
progressive state. Your brother's death was the result of
these latter illnesses and diseases.

(Exh. 5).

  <u>Defendant's Statement of Additional Uncontroverted Facts</u>.

  16.  After Dr. Vakas collapsed, his brother called EMS at 7:45 a.m., and emergency

personnel arrived approximately two and a half hours later at 10:28 a.m. (EMS

Record, Exhibit 7).

  17. Dr. Dudley admitted that Dr. Vakas's fractured hip did not cause his

atherosclerotic cardiovascular disease. (Deposition of Dr. Dudley, Exhibit 2, at

page 19, lines 23 -25 and page 48, lines 23-25).

  18. Dr. Dudley opined that Dr. Vakas went into a "downward spiral" after his cardiac

arrest. (Id., Exhibit 2, at page 21, lines 10-15 and page 39, lines 11 - 14).

  19. Dr. Dudley opined that Dr. Vakas's fall and his heart attack were "two major

blows" that eventually led to his death. (Id., Exhibit 2, at page 36, lines 17-20).

  20.  In response to a question asking whether Dr. Vakas would have survived "if he had not

had a heart attack or whatever cardiac problem he had," and "if he had only fractured the hip," Dr.

Dudley opined that Dr. Vakas "probably would have done pretty well."

  21. Dr. Dudley admitted that Dr. Vakas had significant atherosclerotic cardiovascular

disease. (Id., Exhibit 2, at page 42, lines 1-5).

  22. Dr. Dudley admitted that atherosclerotic cardiovascular disease is, in fact, a

disease. (Id., Exhibit 2, at page 45, line 9 and page 33, lines 6 – 9).

  23. Dr. Dudley admitted that atherosclerotic cardiovascular disease is a naturally

occurring disease that is progressive in nature. (Id., Exhibit 2, at page 45, lines 14

– 17).

24. Dr. Vakas also had diabetes, which is a naturally occurring disease. (Id., Exhibit

2, at page 45, line 23 through page 46, line 11).

25. Dr. Vakas's diabetes had caused his kidneys to fail. (Id., Exhibit 2, at page 46,

lines 2 – 5).

26. Due to the failure of his kidneys, Dr. Vakas required dialysis treatments three

times a week. (Plaintiffs' Statement of Uncontroverted Facts at ¶ 5).

27. A fractured hip, or any other broken bone, does not cause atherosclerotic

cardiovascular disease. (Deposition of Dr. Dudley, Exhibit 2, at page 22, lines

13-17 and page 19, line 23 through page 20, line 15).

28. A fall would not cause a person to go into cardiac arrest unless something struck

that person in the chest that caused a cardiac arrhythmia. (Id., Exhibit 2, at page

22, lines 18 – 24).

29. There is no evidence that anything struck Dr. Vakas in his chest and caused a

cardiac arrhythmia. (Id., Exhibit 2, at page 22, line 25 through page 23, line 2).

30. Dr. Dudley admitted that Dr. Vakas's atherosclerotic cardiovascular disease was a

longstanding, chronic medical condition. (Id., Exhibit 2, at page 23, lines 11-14).

31. The fact that Dr. Vakas had atherosclerotic cardiovascular disease, diabetes and

other long-term conditions contributed to the fact that he did not recover after his

hip fracture. (Id., Exhibit 2, at page 23 line 3 through page 24, line 9).

32. A "heart attack" occurs when there is significant narrowing of the coronary

arteries and a clot develops that blocks the flow of blood to the heart. (Id.,

Exhibit 2, at page 24, line 20 through page 25, line 12).

33. [ The court finds this fact is controverted.]

34. Dr. Dudley admitted that Dr. Vakas's atherosclerotic cardiovascular disease,

directly or indirectly, contributed to his death. (Id., Exhibit 2, at page 51, lines 10

– 14).

35. Dr. Sibley completed the Certificate of Death for Dr. Vakas on March 22, 2005.

(See Death Certificate, Exhibit 5).

36. In the Death Certificate, Dr. Sibley listed "atherosclerotic cardiovascular disease"

as the Immediate Cause of Death. (Id.)

37. Dr. Sibley listed diabetes mellitus, renal failure, hypertension and hip fracture as

"other significant conditions contributing to death, but not resulting in the

[atherosclerotic cardiovascular disease]". (Id.)

38.  Dr. Sibley has opined, based upon his review of the records, that Dr. Vakas's

death likely resulted from a myocardial infarction due to atherosclerotic

cardiovascular disease. (See Dr. Sibley's Response to Written Interrogatories,

Exhibit 3).

39. Dr. Sibley has opined that Dr. Vakas's hip fracture, as well as other medical

conditions, played "more indirect and minor roles" in his death. (Id.)

40. Dr. Robert Okada is a cardiologist who provided treatment to Dr. Vakas on

February 8, 2005. (See Deposition of Robert Okada, Exhibit 8, at page 4, line 16

through page 5, line 13).

41. Hip fractures are not a known risk of atherosclerotic cardiovascular disease, as they are "not known to be associated with developing cholesterol and narrowing the coronary arteries. (Id., Exhibit 8, at page 8, lines 9 – 12).

42. Dr. Okada testified that Dr. Vakas's fractured hip had no bearing upon his heart disease. (Id., Exhibit 8, at page 8, lines 13 – 16).

43. Prior to his collapse on February 8, 2005, Dr. Vakas had been taking Lisinopril and Lasix to treat his hypertension. (Id., Exhibit 8, at page 8, line 22 through page 9, line 2).

44. Heart catheterization is a procedure to ascertain the extent of narrowing, if any, in a patient's coronary arteries. (Id., Exhibit 8, at page 9, line 24 through page 10, line 10).

45. Dr. Okada performed a heart catheterization to diagnose Dr. Vakas's cardiac status. (Id., Exhibit 8, at page 9, line 14 – 17).

46. The results of the catheterization revealed that Dr. Vakas had 80% right coronary artery stenosis, 80% posterior lateral stenosis, 60% obtuse marginal stenosis, 75% left main stenosis and 100% left anterior descending stenosis. (Id., Exhibit 8, at page 10, lines 16 – 24).

47. The catheterization results were significant, and indicated that Dr. Vakas had severe coronary artery disease. (Id., Exhibit 8, at page 25, line 25 through page 26, line 4).

48. The fact that one of Dr. Vakas's three main arteries was closed off completely indicated that he had sustained a heart attack. (Id., Exhibit 8, at page 12, lines 4 –

11

9).

49. The fall that Dr. Vakas had on the morning of February 8, 2005 did not result in severe damage to his heart, nor did it cause his coronary arteries to narrow, for the most part. (Id., Exhibit 8, at page 13, lines 6 – 13).

50. Dr. Okada testified that Dr. Vakas had "serious cardiac problems" on the day he fell in his home. Dr. Okada stated that most of Dr. Vakas's problems existed for some time, although he couldn't say if it was months, or years, or decades.  (Id., Exhibit 8, at page 16, lines 7 – 12 and page 21, lines 11 - 22).

51. Atherosclerotic cardiovascular disease is generally progressive in nature, and if left untreated, gets worse over time. (Id., Exhibit 8, at page 21, line 23 through page 22, line 10).

52. Each of Dr. Vakas's Penn Mutual life insurance policies had an attached rider called the "Accidental Death Benefit Agreement." That Agreement is attached hereto as Exhibit 6, and its contents are incorporated herein by reference. The "Accidental Death Benefit Agreement" expressly provides that "The Accidental Death Benefit shall not be payable if the Insured's death results directly or indirectly from: (1) illness or disease of any kind or from physical or mental infirmity . . ."

53. Dr. Jerome Miller opined that Dr. Vakas's renal failure, diabetes, hypertension, coronary artery disease and congestive heart failure were the causes of his death. (See Exhibit 4).

II. _Standards Governing Summary Judgment_.

The standards and procedures for summary judgment are well established. _See Celotex Corp. v. Catrett_, 477 U.S. 317, 323-24 (1986).  Summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  _Id._; Fed.R.Civ.P. 56(c). A principal objective of the summary judgment rule is to isolate and dispose of factually unsupported claims.  _Celotex_, 477 U.S. at 323-24.  A disputed fact is "material" for purposes of summary judgment if it might affect the outcome of the suit under the governing law, and a dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party.  _Anderson v. Liberty Lobby, Inc_., 477 U.S. 242, 248 (1986).

Under Rule 56, the movant bears the initial burden of making a prima facie demonstration of the absence of a genuine issue of material fact and entitlement to judgment as a matter of law. _See Adler v. Wal-Mart Stores, Inc_., 144 F.3d 664, 670 (10th Cir.1998). This burden may be satisfied by pointing to an absence of evidence on an essential element of the non-movant's claim.  _Id._ at 671 (_citing Celotex_, 477 U.S. at 325)). Once the moving party carries this burden, the opposing party cannot simply rest upon the pleadings; it must come forward with "specific facts showing that there is a genuine issue for trial." _Matsushita Elec. Indus. Co ., Ltd. v. Zenith Radio Corp_., 475 U.S. 574, 587 (1986). At this stage of the proceedings, the court must examine the evidence on a motion for summary judgment in the light most favorable to the non-moving party.  _Jones v. Unisys Corp_., 54 F.3d 624, 628 (10th Cir.1995).

III. *Discussion*.

Under the accidental death benefit provisions at issue in this case, Penn Mutual may be liable to pay a death benefit upon proof that the death of the Insured was "the result, directly and independently of all other causes, of accidental bodily injury," but not "if the Insured's death results directly or indirectly from ... illness or disease of any kind or from physical ... infirmity...."  It is incontestable here that one or more pre-existing diseases, including heart disease, were contributing factors in Dr. Vakas' death.  At the same time, plaintiff has cited evidence that Dr. Vakas' death probably would not have occurred when it did but for the accidental fall and complications resulting from his fractured hip.  It is certainly possible to construe the above policy language as excluding coverage in such circumstances, particularly if emphasis is placed upon the requirement that accidental death result "independently of all other causes," and not "directly or indirectly from ... disease...."  Some jurisdictions have concluded that language of this sort precludes recovery where a pre-existing disease combines with an accidental injury to cause death.  *See e.g.*, *Pelkey v. Gen. Elec. Capital Assur. Co.*, 804 A.2d 385, 389 (Me. 2002) ( an explicit disease exclusion will work to exclude coverage where a disease and an accident combine to produce a loss).  *But see id., n. 2* (citing contrary cases from other jurisdictions); *Keller v. Monumental Life Ins. Co.*, 2006 WL 2855095 (Tenn.Ct. App. 2006)("It is inescapable that the Decedent's death was not independent of all other causes....").

The general treatise American Jurisprudence (Second) surveys this area of law in the following manner:

> In accident insurance the question whether the insurer is liable for an injury depends on the proximate cause of the loss. The term "proximate cause," as here used, means the same as in other insurance cases, and a provision requiring loss to be caused by

14

accident independent of all other causes is equivalent to a provision requiring it to be the proximate cause.

It is generally unnecessary that the accident be the sole cause of death or injury in order to establish the liability of the insurer, but it is sufficient that the accident is the dominant cause, even though remote in point of time or place. The accidental injury may have set in motion a chain of events that resulted in death, even though some other condition may also have contributed to it. The parties may, however, expressly provide that the death or injury must be caused directly or solely by accidental means, independently of all other causes, in which case the accident must be the sole cause of the insured event.

43 Am.Jur.2d § 565 (West 2003) [citations omitted].

As to whether a pre-existing disease is considered the proximate or substantial cause, the same treatise states the following:

Disease and accident may both be present in cases arising under accident insurance policies. In the absence of any provision of the policy specifically controlling the matter, whether the insurer is liable depends upon whether the death or injury is attributable to the accident or to the disease, and upon a determination of proximate cause.

A disease or infirmity that does not substantially contribute to death or disability does not preclude recovery under an accident insurance policy if an accident is the direct or proximate cause of death or disability, even though the policy excepts death or injury caused by disease or infirmity. * * *  When a dormant growth, condition, or disease within the body is excited by an accident so that it rapidly results in disability or death which, but for the accident, would have been deferred, the worsening of the insured's condition is a result of the accident and is therefore within a an accident policy, although activation of a dormant condition has also been held to be a result of the disease, not the accident.
* * *

The phrase "directly and independently of all other causes" as used in an accident policy requires a showing that the accident was the predominant cause of injury.
* * *

15

*Id*. §§ 608-609 [citations omitted].

The prevalence of heart disease has given rise to a flood of litigation in this area, and the

subject merits its own separate section in the above-cited treatise:

> When a policy contains a clause barring recovery for death caused directly or indirectly by disease, death as the result of a heart attack suffered while sitting at a desk on the job is generally not held to have been caused by violent, external, and accidental means; even in the event of a stressful event, if the medical reports indicate that heart disease existed prior to the heart attack, it is not considered an accident. Recovery for injury or death involving heart attacks and similar conditions are often precluded by the terms of an exclusion for loss from disease or bodily infirmity when, for example, the heart attack occurred while the insured was driving, causing an automobile accident that produced the injury or death for which recovery was sought. However, in one case, exclusions for loss "caused by" and "resulting from" "disease or bodily infirmity" was held not to apply to bar coverage for a fatal, single-car crash caused by the insured's heart attack.
>
> Exclusionary clauses for loss from disease or bodily infirmity often preclude recovery in automobile crashes where the insured has a history of heart disease. It may be a question for the trier of fact whether heart disease substantially contributed to the death or disability, precluding coverage. Recovery has also been denied in a number of other circumstances where someone with heart problems died after strenuous activity.
>
> On the other hand, recovery has been allowed despite the involvement of a heart attack or similar conditions when the insured's heart disease was in a dormant condition, but emotional stress and strain were superimposed upon the preexisting diseased coronary arteries and heart so as to cause death.

*Id*. § 610 [citations omitted].

Against this background, the court turns to the substantive law of Kansas, which governs the

instant dispute.  In *Williams v. Benefit Trust Life Ins. Co.*, 200 Kan. 51, 434 P.2d 765 (1967), the

Court examined a policy that promised a disability benefit for bodily injury brought about by an

accidental cause, but which excluded any loss "due wholly or in part to any disease or sickness...."

The plaintiff in that case was going down some steps when his knee gave way and he fell, resulting

in injuries that rendered him unable to work.  The insurance company denied the claim on the

grounds that the plaintiff had long suffered from arthritis in both knees; it argued that the disease

was the cause, in whole or in part, of his injuries.  The Kansas Supreme Court noted a divergence

of authority on the matter, and recognized that some jurisdictions bar recovery under an accident

policy "where the injury aggravates the effect of a preexisting disease or infirmity, or the disease

or infirmity aggravates the effect of the injury, and both together cause the death or disability, even

though it is thereby caused at a period sooner than it otherwise would have occurred."  The Kansas

Supreme Court declined to adopt that view, however, finding the "better rule" to be "that where an

accidental injury aggravates or energizes a dormant disease or physical ailment[,] the accident may

be said to have been the proximate cause of the resulting disability within the terms and meaning

of the ordinary accident insurance policy."  (*Citing Williams v. General Accident Fire & Lie

Assurance Corp.*, 144 Kan. 755, 62 P.2d 856 (1936)).[1]

In *Boring v. Haynes*, 209 Kan. 413, 496 P.2d 1385 (1972), the Insured was a 54-year old man

admitted to the hospital in March of 1967 for a diseased gall bladder.  On the same evening he was

discharged, he had a myocardial infarction and was re-admitted.  He had a relatively uneventful

recovery and was discharged a couple of weeks later and placed on medication.  He continued to

have chest pains and was placed on additional medication, although he had no signs of heart failure

or further infarction.  He was hospitalized again for gall bladder attacks in May 1967, and in June

---

[1] In a prior case, *Johnson v. Farmers & Bankers Life Ins. Co.*, 173 Kan. 8, 244 P.2d 199 (1952), the Supreme Court noted these two lines of authority but found it unnecessary in that case to choose between them.  *Id*. at 11.

1967 had his gall bladder removed.  The Insured did not return to work thereafter but was active

around the house.  He had no further symptoms and was contemplating a return to work.  On July

17, 1967, he was driving an automobile when he was struck from the rear by another car.  He got

out and talked to some of the people involved, and then returned to look at the damage to his car.

When he did so, he suddenly collapsed.  He was taken to the hospital, but pronounced dead.  An

autopsy disclosed that the immediate cause of death was myocardial infarction due to coronary

arteriosclerosis.  The evidence in the case included an opinion from a physician who stated that the

man's death was caused by an influence of stress superimposed on existing heart disease.  The trial

court granted summary judgment in favor of the insurance carrier on the grounds that the death was

caused in part by disease, and was thus excluded from coverage.  Relying on the principle adopted

in *Williams v. Benefit Life Trust*, the Supreme Court found that summary judgment was

inappropriate.  In its syllabus, the Court said that "in the event an insured sustains physical disability

or death resulting from an accidental injury which aggravates or causes a dormant disease or ailment

to become active, the disability or death will be regarded as having been caused solely by the injury,

so as to render an insurer liable therefor under an accident policy, even though such disability or

death might later have resulted regardless of the accident, and even though the accident might not

have affected a normal person to the same extent."  *Id*., Syl. ¶ 3.  The Court characterized a

"dormant disease" as "one which is quiescent, passive, resting or static as opposed to one which is

active, lively, or effective."  *Id*. at ¶ 4.  The Court said "the record here reveals an unusual external

stimulus – the automobile collision – exerting that which has been characterized as emotional stress

and strain upon the decedent, so as to precipitate or cause his death.  Assuming that causation is

factually established, we believe this fortuitous event constitutes accidental bodily injury within the

meaning of the policy provisions and we so hold." *Id.*, 209 Kan. at 422.

Under the construction Kansas courts have given this policy exclusion, the court cannot find that summary judgment is warranted in favor of either party. Plaintiff has cited opinion testimony from the Chief Medical Examiner in Sedgwick County that Dr. Vakas died as a result of complications from a broken hip. Plaintiff has cited medical opinion testimony that it was not coincidental that Dr. Vakas' heart or breathing stopped right after he fractured his hip, and that this played a role in making his pre-existing conditions worse. There is evidence of opinions from more than one doctor that Dr. Vakas would not have died at the time he did but for the fractured hip. There is opinion testimony that the immobilization resulting from the fractured hip contributed to his death, and that but for the fracture, he would have lived longer. All of this evidence, viewed in a light most favorable to the plaintiff, could be said to give rise to a reasonable inference that the accident and resulting broken hip was the proximate cause of his death. As Dr. Dudley noted, "as soon as [Dr. Vakas] fell, he had a downward spiral of events that led to his death." *Cf. Landress v. Phoenix Mut. Life Ins. Co.*, 291 U.S. 491 (1934) (Cardozo, J. dissenting) ("When a man has died in such a way that his death is spoken of as an accident, he has died because of an accident, and hence by accidental means."). Insofar as Dr. Vakas' pre-existing diseases are concerned, defendant points out that the heart disease, diabetes (with renal failure), and hypertension from which Dr. Vakas suffered were all progressive in nature, and it argues this precludes any finding that the hip fracture aggravated or energized a "dormant" disease. While this argument might well be persuasive to a jury, the court cannot say that under Kansas law no reasonable jury could find otherwise. The progressive nature of heart disease did not prevent the Kansas Supreme Court in *Boring* from finding a jury question as to whether the insured's accident aggravated a dormant disease, despite the fact

19

the insured had a heart attack only a few months prior to his death and the immediate cause of death was determined to be myocardial infarction due to coronary arteriosclerosis.  Nor did the insured's "osteoarthritic condition in both knees for many years" preclude recovery in *Williams v. Benefit Life*.  Under the standard adopted by the Kansas courts, there appears to be no bright-line distinction between a "dormant" and an "active" disease, a fact which led this court some 35 years ago to submit the question to a jury for its determination.  *Cf. Embry v. Equitable Life Assurance Soc.*, 451 F.2d 472, 485 (10th Cir. 1971) (District court properly charged jury on the *Williams v. Benefit Trust Life* standard).  The court notes that the undisputed facts here do not disclose much about the circumstances of Dr. Vakas' day-to-day condition prior to his fall.  It may be that the plaintiffs could produce evidence showing he was in relatively stable health at the time of the accident despite his numerous problems.   Under Kansas law, the court concludes it is a question of fact for a jury to determine whether Dr. Vakas' diseases were in a dormant condition and were energized or aggravated by the accident, or instead whether they were advanced, active and progressive such as to be considered the proximate cause of his death.

"In construing an insurance policy, a court should consider the instrument as a whole and endeavor to ascertain the intention of the parties from the language used, taking into account the situation of the parties, the nature of the subject matter, and the purpose to be accomplished."  *Iron Horse Auto, Inc. v. Lititz Mut. Ins. Co.*, 283 Kan. 834, 156 P.3d 1221, 1225 (2007). [citation omitted].  The language of the policy is "tested by what a reasonably prudent insured would understand the language to mean, not by what the insurer intended the language to mean." *Id.* (*citing Liggatt v. Employers Mut. Casualty Co.*, 273 Kan. 915, Syl. ¶ 3, 46 P.3d 1120 (2002)).  In *Bukata v. Metropolitan Lide Ins. Co.*, 145 Kan. 858, 67 P.2d 607 (1937), the Court quoted a passage from

*Elsey v. Fidelity & Casualty Co. of New York,* 187 Ind. 447, 120 N.E. 42 (1918) to the effect that:

> "The purpose of accident insurance is to protect the insured against accidents that occur while he is going about his business in the usual way, without any thought of being injured or killed, and when there is no probability, in the ordinary course of events, that he will suffer injury or death. The reason men secure accident insurance is to protect them from the unforeseen, unusual, and unexpected injury that might happen to them while pursuing the usual and ordinary routine of their daily vocation, or the doing of the things that men do in the common everyday affairs of life."

*Bukata*, 67 P.2d at 611-12. Although a jury might well find that Dr. Vakas was suffering from active diseases that resulted in his death, a jury could also reasonably find that his death resulted from accidental bodily injury.

   IV. *Conclusion*.

   Plaintiff Gus Vakas and George Vakas' Motion for Summary Judgment (Doc. 22) and defendant Penn Mutual Life Insurance Company's Motion for Summary Judgment (Doc. 26) are DENIED.

   IT IS SO ORDERED this __21st__ Day of September, 2007, at Wichita, Ks.


                                    s/Wesley E. Brown
                                    Wesley E. Brown
                                    U.S. Senior District Judge